# MARYLAND REPORTS.

## APRIL TERM, A. D., 1877.

ROCK HILL COLLEGE *vs.* THOMAS JONES, and others, Administrators, and the BOARD OF COUNTY SCHOOL COMMISSIONERS OF HOWARD COUNTY.

### VESTED RIGHTS.

*Code, Art. 93, sec. 136—Acts 1876, ch. 295, and ch. 377—Distribution of surplus of intestate's estate, where no surviving relatives within the fifth degree—Power of Legislature to disturb Vested Rights by subsequent legislation—Statutory construction.*

A bill was filed by Rock Hill College on the equity side of the Circuit Court for Howard County, to compel the administrators of James Stratton, late of said county, deceased, to pay over to the College the surplus remaining in their hands after the final settlement of the estate, the said Stratton having died intestate, unmarried and leaving no relations within the fifth degree, who were by law entitled to claim such surplus. The college claimed the surplus under sec. 136 of Art. 93, of the Code. The defendants demurred to the bill, relying upon the Acts of 1876, ch. 295 and ch. 337. The demurrer was sustained in the lower Court, but on appeal it was HELD:

1st. That the State has no original prerogative right to appropriate such funds to its own use, in the absence of statutory rules of distribution. In England, even in the ancient period of her jurisprudence, when power was arbitrary and the rights of the subject but ill-defined, such prerogative was not claimed.

1         v. 47.

2nd. Rights that pass and become vested under the existing law of the land are supposed to be beyond the control of the State through its Legislature. The mere change of the law does not divest or impair the rights of property acquired before the change, even though the Legislature may intend the new law so to operate.

3rd. The State, as to this fund, is a mere trustee, with a full and explicit declaration of trust, made by authority of the trustee itself.

4th. Such, however, would not be the effect of a gratuitous appropriation by the State *of its own revenue.*

5th. The language used by the statute, directing the State to pay over the money to a particular corporation, in this case vested a right to the money in that particular corporation as fully as if it had directed the money to be paid to a particular person or class of persons, which right it was beyond the power of the legislature to disturb.

6th. The matter of distribution of an intestate's personal estate is regulated by positive law, and any person within the rules prescribed acquires a right of which he cannot be divested by a retroactive law.

APPEAL from the Circuit Court for Howard County, in Equity.

James Stratton died in Howard County, in July, 1875, intestate, unmarried and leaving no relations surviving him within the fifth degree, reckoning in the mode prescribed by sec. 136, Art. 93, of the Code. Administration upon his estate was granted to J. Thomas Jones and others. Upon settlement of the estate there remained in the hands of the administrators a large surplus. Rock Hill College, an incorporated body, under the Act of 1865, ch. 10, and the only College located in Howard County, filed its bill in the Howard County Court, in Equity, claiming the surplus under Art. 93, sec. 136, of the Code. The provision of the Code upon which the College relied was as follows :

" If there be no widow or relation of the intestate within the fifth degree, which shall be reckoned by counting down from the common ancestor to the more remote, the whole surplus shall belong to the State, and *shall be paid to the*

*College,* if any, in the county where the deceased shall die, or if none, to any school in the county to which the public aid may by law be extended, &c." To this bill, the Board of County School Commissioners of Howard County demurred, relying upon the Acts of 1876, ch. 295, and ch. 377. The first of these Acts (ch. 295,) repealed sec. 136, of Art. 93, of the Code, and re-enacted it so as to provide for the distribution of such a surplus as follows: "the whole surplus shall belong to the State, and shall be paid to the Board of County School Commissioners of the County, wherein letters of administration shall be granted upon the estate of the deceased, for the use of the public schools of said county."

The other Act (ch. 377,) had special reference to the surplus of James Stratton's estate, and provided that the administrators should "pay over the whole surplus of said estate to the Board of County School Commissioners of Howard County." The complainant contended that it had a vested right in this surplus immediately upon the death of Stratton, which it was incompetent for the Legislature to disturb by subsequent legislation.

The demurrer raised the question as to the effect of this subsequent legislation. The Court below (MILLER and HAMMOND, J.,) in rendering its decision delivered the following opinion.

" An important and interesting question is presented by the demurrer to this bill. It appears that James Stratton died in Howard County intestate, in July, 1875, possessed of a large personal estate, and without leaving a widow or relatives in the fifth degree. Administration was granted upon his estate, and there remains a surplus after payment of debts and funeral expenses. The complainant, a College duly incorporated by the Act of 1865, ch. 10, and (upon the facts admitted by the demurrer,) the only College located in that county, claims this surplus, under section 136, of Article 93, of the Code, which provides

that 'if there be no widow or relations of the intestate within the fifth degree, which shall be reckoned by counting down from the common ancestor to the more remote, the whole surplus *shall belong to the State,* and shall *be paid* to the college, if any, in the county where the deceased shall die, or if none, to any school in the county to which public aid by law may be extended, and if none, to the county where the property of the intestate shall lie.'

"We agree entirely with the complainant's solicitors in their construction of this section in one respect. It seems to us very plain from the language here used, that *colleges* in the several counties are made recipients of .this bounty to the exclusion of *schools,* no matter whether said colleges are aided by State appropriations or not. If there be no college in any county, then the schools to which public aid is by law extended are to receive it. The qualification as to State aid applies to schools only, and excludes schools conducted by private individuals at private expense, and for private profit. This seems to us the natural and obvious meaning of the language used. If therefore this section was still in force, we should have no hesitation in overruling the demurrer.

"But this section of the Code was repealed by the Act of 1876, ch. 295, and re-enacted so as to provide that in such case 'the whole surplus shall belong to the State, and shall be paid to the Board of County School Commissioners of the county wherein letters of administration shall be granted upon the estate of the deceased, for the use of the public schools of said county;' and by a special Act of the same session, (ch. 377,) the administrators of Stratton are directed to pay over the whole surplus of his estate to the Board of School Commissioners of Howard County. This repealing Act and special law were passed after the death of Stratton, but before the surplus of his estate had been paid over under the repealed section, and even before the amount of such surplus had been ascer-

tained by the accounts of the administrators. If this special law is constitutional and valid, or if the repealing Act validly changes the appropriation of this fund, then the claim of the College necessarily fails.

" But it has been earnestly and ably argued that both these laws are inoperative and void, so far as they seek to affect this case. The position taken is, that upon the death of Stratton, the College acquired, under the law as it then stood, a vested right to the surplus of his estate, which could not be. divested by subsequent legislation. In support of this proposition, the cases chiefly relied on, are *Wilderman vs. City of Balto.*, 8 *Md.*, 551, and *State, use of Trustees of M. E. Church vs. Wassen, et al.*, 28 *Md.*, 338 ; and unless the present case can be clearly distinguished from them, they must control its decision. In each of those cases there was a bequest or devise by will, which was inoperative and void when the will took effect, and the Court in each case held that it was not competent for the Legislature to do anything by subsequent legislation which would validate these void bequests, and thereby divest the rights of the residuary devisees, or next-of-kin, which had become vested immediately upon the death of the testator. In the first of them, (8 *Md.*, 556,) the Court say : 'It was not in the power of the Legislature to give to the Act of 1842, ch. 86, such a retrospective operation as to divest the vested rights acquired under the will.'

But is the legislation here assailed similar to that which those decisions condemn, or is the claim of this college, under the law as it stood at Stratton's death, similar in principle to the rights which the Court in those cases protected? In other words, did this College, by virtue of the 136th section of Art. 93 of the Code, acquire immediately, upon the death of Stratton, a vested right in this surplus, which it was not competent for the Legislature to interfere with. After a careful consideration of this question, and the arguments of counsel, we are of opinion it must

be answered in the negative.　In reaching this conclusion, we of course rely chiefly upon what we regard as the true construction and effect of the legislation which has taken place on this subject in this State.

"In England, it was originally the law that the King, as *parens patriæ* and general trustee of the kingdom, was entitled to seize upon the goods of persons dying intestate, whether they left kindred or not.　But by the statutes regulating the administration and distribution of estates, in force there at the time of the colonization of Maryland, and until a comparatively recent period, the administrator would be entitled to a surplus arising in a case like the present.　This right of the administrator however, was repudiated as unjust, and taken away in Maryland by very early legislation.　The Act of 1719, ch. 14, the first upon the subject, recites that it frequently happens that persons who are possessed of considerable personal estates, die intestate, leaving no relations or representatives legally entitled to the residue; in which cases some creditor commonly obtains the administration, and thereby becomes legally possessed of the goods and chattels of the deceased, and therefrom not only satisfies himself and other creditors, but retains the residue of the estate, and converts it to his own use on pretence of securing himself against such latent debts as may thereafter appear.　Whereby he has the sole benefit of such goods and chattels, as he has no pretence of right to, save to satisfy his debt, and perhaps but a small one; and then for the more just and better application of such residues for the future, enacts 'that every such administrator shall be obliged to pay and satisfy the balance of such estates to one of the public treasurers of this Province, for the time being, in the same manner as such administrator should have been obliged to pay the same to any legal residuary legatee by law, in case any such should have appeared, to be applied to the use of schools, in the

same manner as the additional duty of twenty shillings per poll on Irish servants and negroes is directed,' to be applied by the Act 1717, ch. 10. It is manifest that by this law, the State took to itself these residues, and applied them to the use of the schools, as it applied to the same purpose a part of its revenue derived from taxation. That Act treats these funds as constituting part of the public revenues, and the schools receive them simply as a bounty appropriated to them by the State. The 17th section of the Act of 1729, ch. 24, (which is the next provision on the subject,) requires the administrators thereafter ' to pay and satisfy the balance of such estate to the visitors of the public school of the county where the deceased resided, in the same manner as such administrator should have been obliged by law to pay the same to any legal representative, in case any such should have appeared, to be applied to the use of such schools.' This in no wise changes the State's assertion of ownership, or its right to appropriate such balances at its pleasure, and places the interest of the public schools therein on no different foundation. It merely substitutes the visitors of the public schools for the treasurers, as the agents by whom the State's bounty is to be received and applied to the purposes of education.

"The Act of 1798, ch. 101, by which the laws and regulations respecting testamentary affairs were reduced into system, provided, (sub ch. 11, sec. 15,) that in such cases ' the whole surplus shall belong to the State, to be applied as the Legislature shall hereafter direct, saving to the different schools in this State, the rights which by existing laws they now respectively possess.' Here is an unequivocal assertion of ownership in the State, with a plain reservation of power to appropriate at will.

"Next comes the 11th and 12th sections of the Act of 1802, ch. 101, in which it is recited : ' Whereas, the personal property of deceased persons who have died or shall

die intestate, without leaving representatives within certain degrees of consanguinity, by the Acts of 1719, ch. 14, and 1729, ch. 24, devolved on the free schools of the county of the deceased, and in most of the counties the free schools having been abolished, the executors or administrators of such deceased persons have retained the property to their own use and benefit ;' and it is then enacted, ' that in all instances, where by law the property of deceased persons would have descended or devolved on the free schools of any county, if such free schools had existed, the same shall be, and it is hereby declared to be. the property of the college, if any in such county, or if none, the property of any school to which the public aid by law has been or may be extended, and if none, to go to the county where the property of such person or persons so dying may be ; and that the trustees of the college or school, or the Justices of the Levy Court, as the case may be, shall have the same right, power and authority to sue for, and recover such property as the visitors, trustees or governors of any such free school might or could have done ; saving to the different schools in this State, the rights which by existing laws they now respectively possess ;' and ' that all moneys or other property recovered or obtained under this Act, if by college or school, shall be applied in the same manner, as other public funds granted them are to be applied, and if by the Levy Court, towards the discharge of the levy, or for the support of schools in the county, as the Justices of the Court may determine on.' It was strongly urged by the complainant's solicitor, that by this statute, the colleges and schools were placed on firmer ground, and were recognized as having vested and indefeasible rights, inasmuch as such funds were thereby expressly declared to be their property. But looking to all its provisions, we are unable to find any renunciation of the State's claim of ownership and right of appropriation, asserted and maintained in previous laws.

The 15th section of the Act of 1798, is not repugnant to, nor expressly repealed by this Act of 1802 ; on the contrary, the latter is in effect, such a legislative application as the former contemplates and provides for. It moreover expressly declares, that all moneys derived under it shall be applied by colleges and schools, in the same manner as other public funds granted them, thus plainly treating and recognizing the money so derived and granted, as part of the public funds of the State.

" Thus stood the law when the Code was adopted, and we think the codifiers rightly considered that so much of the 15th section of the Act of 1798, as declared the surplus ' shall belong to the State,' was in force, as well as the 11th and 12th sections of the Act of 1802, when they made the codification. From these two provisions of existing laws, the 136th section of the Code, already cited, was made up. It asserts the State's ownership of the surplus in the very terms of the 15th section of the Act of 1798, and declares that the same shall be paid to the colleges or schools, or to the counties. In other words, we regard the latter clause of this section as an appropriation of public funds belonging to the State, to colleges and schools, for the promotion of education.

" If we are right in holding that such is the construction and effect of this section, it follows that the right it conferred on this college is very different from the rights which belong to residuary legatees or devisees, or next-of-kin of a deceased testator, claiming as against a void specific devise or bequest. Neither is it a law, (like the Act of 1825, ch. 156,) making those capable of inheriting who were not so previously ; nor does it enlarge the class of individuals who may inherit or receive distribution as next-of-kin. But it is a law by which the State takes to itself money coming from a certain source, and then donates or appropriates it to certain public purposes. The beneficiaries or donees under such a law, acquire no vested right

to the fund so donated or appropriated, until it has been actually paid over to and received by them. All the authorities concur in sustaining the position that a mere gratuity or donation of money, made without consideration, whether by a private individual or by legislative appropriation, and whether to an individual or a corporation, may be retracted and withdrawn, without violating any legal obligation, at any time before the gift has been perfected by actual delivery to the donee. The difference between a law making such an appropriation, and a legislative Act in the nature of an executory contract, which is founded on a sufficient consideration, or an executed contract, or a perfected grant, is clearly stated in the case of the *Trustees of the Bishop's Fund vs. Rider*, 13 *Com.*, 87.

"The subsequent legislation involved in this case, (including the special Act, ch. 377,) which changed the direction and application of this fund, having been passed before this surplus was paid over to the complainant, is therefore, in our judgment, constitutional and valid. There was here no contract, the obligation of which these laws impaired, and no vested right in the complainant which they divested or disturbed.

"If these views as to the nature and character of this legislation be correct, they answer the argument on which much reliance was placed, that by this 136th section of the Code, the State constituted itself and became a trustee of this fund, and made the colleges and schools *cestuis que trust*, thereof in the same manner as if a conveyance by deed or will had been made in the same terms.

"It follows from what we have said, that the demurrer must be sustained, and the bill dismissed, and a decree to that effect will be passed."

From this decision of the Court the complainant appealed.

The cause was argued before* BARTOL, C. J., ALVEY, MILLER and STEWART, J.

*Wm. M. Merrick* and *Roger W. Cull*, for appellants.

1. The title of your appellant to the fund in question vested *eo instanti* the death of the intestate under the 136th section of Art. 93 of the Code. *Wilderman vs. Mayor*, *&c.*, 8 *Md.*, 551; *State, use of, &c. vs. Wassen*, 28 *Md.*, 338; *Lavender's Lessee vs. Gosnell & Trippolett*, 43 *Md.*, 153; *Killam vs. Killam*, 39 *Penn.*, 120; *Norman vs. Hiest*, 5 *Watts & Serg.*, 171.

2. The State held this property after the death of Stratton, not absolutely, but as trustee for the appellant. *Hill on Trustees*, 65, *marginal; Ray vs. Simmons, Am. Law Reg., N. S.*, 15–704.

And even when the trust is purely voluntary, it will prevail against the person creating the trust as complete and irrevocable. *Hill on Trustees*, 82, *marginal; Ray vs. Simmons, Am. Law Reg., N. S.*, 15–704.

3. It is not necessary that there be any actual conveyance or assignment, but if the relation of trustee and *cestui que trust* be effectually constituted, it is a perfect equitable title, and will be enforced. *Hill on Trustees, p.* 83, *marginal.*

4. The right of the appellant having vested on the death of Stratton, it was a right which the Legislature could not disturb by subsequent legislation. *Cooley Const. Lim.*, 279 *and* 358; *Fletcher vs. Peck*, 6 *Cranch*, 87, 135, 137; *Yarmouth vs. N. Yarmouth, Am. Law Reg., O. S.*, 1–596; *Killam vs. Killam, Am. Law Reg., N. S.*, 1–18; *Dash vs. Van Kleck*, 7 *Johns.*, 505; *Oriental Bank vs. Freese*, 18 *Maine*, 112; *Austin vs. Stevens*, 24 *Maine*, 529.

5. And as this cannot be done directly, neither can it be done indirectly, by the express repeal of a statute under which these rights are held. *Benson vs. Mayor, &c.*, 10 *Barb.*, 223; *Killam vs. Killam, Am. Law Reg., N. S.*,

1-18; *S. C.*, 39 *Penna. St. Rep.*, 120; *Greenough vs. Greenough*, 1 *Jones*, 489; *McCartey vs. Hoffner*, 23 *Penn.*, 507.

6. The 136th sec. of Art. 93, was part of the law of distribution, and was analogous to that of 1825, chap. 156, by which those were made capable of inheriting who were not so previously, and enlarged the class of individuals benefited by the law of distribution, and the intestate left this property to the College by this statutory will. *Killam vs. Killam, Am. Law Reg., N. S.*, 1–21.

7. The case of the *Trustees of the Bishop's Fund vs. Rider*, 13 *Com.*, 87; which was mainly relied on by the Court below, was based upon a special statute, essentially different from our own, and therefore presents no analogy to the present case. See remarks of counsel for State in that case as approved by the Court, p. 99.

*Edwin Linthicum, J. Thomas Jones* and *Henry E. Wootton*, for appellee.

The question raised by the demurrer and now submitted for adjudication is, did the appellant, upon the death of the intestate, have a vested interest in his estate which cannot be divested by any legislation subsequent to said death.

It is conceded that the next-of-kin under the statute of distribution have such a vested interest in the estate of their intestate as cannot be divested by any legislation subsequent to the death of such intestate. The statute in such cases is the implied will of the deceased, and is as sacred as his expressed will would have been. Therefore, the will of the intestate was, that his property should belong to the State, and the Act of 1876, ch. 295, did not in fact alter in any respect the implied will of the intestate, which existed at his death; in each case the surplus belongs to the State. The State receives it stamped with all the incidents of property; if she contracts in regard to

it, she is bound by the contract ; if she makes a donation she can retract until the gift is perfected by delivery. The intestate desired his property should go the State, to be disposed of as the Legislature should deem the best interests of the State demanded.

The surplus belongs to the State. *Acts* 1719, *ch.* 14, *sec.* 2 ; 1729, *ch.* 24, *sec.* 17 ; 1798, *ch.* 101, *sub ch.* 11, *sec.* 15 ; 1802, *ch.* 101, *secs.* 11 *and* 12.

These Acts are fully reviewed in the opinion of the learned Court below, and which is incorporated in the record.

The General Assembly has absolute control over the finances of the State. The appropriation under sec. 136, of such revenue as the State derives from the estates of persons dying intestate and without relatives, can be revoked at any time until the gift is perfected by delivery. *Trustees of Bishop's Fund vs. Rider*, 13 *Com.*, 87 ; *Wilson vs. Jenkins*, 72 *North Car.*, 5 ; *Quick vs. White Water Township*, 7 *Ind.*, 570.

The *surplus* must be paid, as directed, by the provisions of the law in force, when the surplus is ready for distribution. *Day vs. Day*, 22 *Md.*, 530 ; *Patterson vs. Gelston*, 23 *Md* , 433 ; *Price vs. Sessions*, 3 *Howard*, 635 ; *Clark vs. McCleary*, 20 *Miss.*, (12 *Smedes & Marshall*, 347.)

ALVEY, J., delivered the opinion of the Court.

The Rock Hill College, the appellant in this case, was incorporated by the Act of 1865, ch. 10, and, by the admission of the demurrer to the bill of complaint, is the only college located in Howard County. James Stratton died in that county in July, 1875, intestate, possessed of a considerable personal estate, and without leaving a widow or children, or descendants of children, or other relations within the fifth degree, reckoned by counting down from the common ancestor. There has been an administration upon the estate of the intestate, and there remains a con-

siderable surplus of such estate, after the payment of debts, funeral charges, and expenses of administration. This surplus is claimed by the appellant, and the object of the present bill is the assertion of that claim as against the claim to the fund set up by the Board of County School Commissioners of Howard County, under the general Act of 1876, ch. 295, and the special Act of the same session, chapter 377.

The foundation of the appellant's claim is the 136th section of Art. 93, of the Code, as that section stood before its repeal and re-enactment by the Act or 1876, ch. 295, to which we have just referred. That section, as it stood before the repeal, provided that "If there be no widow or relations of the intestate within the fifth degree, which shall be reckoned by counting down from the common ancestor to the more remote, the whole surplus shall belong to the State, *and shall be paid* to the college, if any, in the county where the deceased shall die, or if none, to any school in the county to which the public aid by law may be extended, and if none, to the county where the property of the intestate shall lie." This section was codified from the provisions of the Acts of 1798, ch. 101, sub ch. 11, sec. 15, and 1802, ch. 101, sec. 11. In the first of these Acts it was provided, that "the whole surplus shall belong to the State, to be applied as the Legislature shall hereafter direct, saving to the different schools in this State *the rights* which, by existing laws, they now respectively possess." While this statute fully recognized the rights that had been acquired by the schools, it was soon after modified by another, that of 1802, ch. 101, sec. 11, whereby, instead of allowing the fund to remain undisposed of as under the Act of 1798, where there was no schools in the county, it was provided, that in all instances where by law the property of deceased persons would have descended or devolved on the free school of any county, if such free school had existed, the same should be and

was thereby declared to be, *the property* of the college, if any, in such county, or if none, the property of any school to which the public aid by law had been or might be extended, and if none, to go to the county where the property of such person or persons so dying might lie ; and that the trustees of the college or school, or the justice of the levy Court, respectively, as the case might be, should have the same right, powers and authority, to sue for and recover such property, as the visitors, trustees or governors, of any such free school might or could have done.

The Act of 1876, ch. 295, as we have already said, repealed the 136th section of Art. 93 of the Code, and re-enacted the same in the terms of the section as it originally stood in the Code, except that, instead of the direction that the surplus should belong to the State, and should be paid to the college, if any, in the county, or if none, to any school, etc., the re-enacted section provides that "the whole surplus shall belong to the State, and shall be paid to the Board of County School Commissioners of the county wherein letters of administration shall be granted upon the estate of the deceased, for the use of the public schools of said county."     There is nothing in the section thus enacted that looks to its operation upon past cases; and it would appear that the Legislature supposed the change in the law by the repeal and re-enactment of this section of the Code would not retroact and control this case; for among the laws of the same session we find the special Act, chapter 377, wherein, after reciting the facts of the case, it is enacted that the administrators of the deceased, after the passage of their final account, "shall pay over the whole surplus of said estate to the Board of County School Commissioners of Howard County;" provided, no relation of the intestate, within the fifth degree, shall appear and claim, &c.

Relying upon these Acts of 1876, the appellees demurred to the bill of complaint filed by the appellant; and the

question is, was the right of the latter to receive the fund, under the Code, Art. 93, sec. 136, of a nature and character to be subject to the control of the Legislature, and the fund liable to be diverted from the objects and purposes declared in the law which was in force at the death of the intestate? This question was resolved in the affirmative by the Court below, and we are now required to review that decision.

The appellant contends that the 136th sect. of Art. 93 of the Code was part of the law of distribution, and that, by force of that law, the right and title to the fund vested in the appellant, through the State as mere trustee, *eo instanti* the death of the intestate; and the right being vested, it could not be divested and the fund appropriated to other objects and uses, by subsequent legislation. While, on the other hand, it is contended by the appellees, that the operation of the 136th section referred to was simply an appropriation of revenue, derived by the State from the estates of persons dying intestate, and without relations within a certain degree, and that it was competent to the Legislature to revoke such appropriation at any time before the fund was actually paid over by the administrators.

Without reference to any question as to whether the general Act of 1876, ch. 295, could be fairly so construed as to have a retroactive effect, or whether it was competent to the Legislature to pass the special Act of 1876, ch. 377, under the 33rd section of the 3rd Article of the Constitution, which provides that the General Assembly shall pass *no special law*, for any case, for which provision has been made by *an existing general law*, the right here involved, according to the contention of the parties, depends upon the question, whether the State held an absolute, disposable right in the fund, at and from the time of the death of the intestate, irrespective of the imperative provision that such fund should be paid over to the college?

That the State has any original prerogative right to appropriate the fund to its own use, in the absence of statutory rules of distribution, is a proposition that cannot be maintained. In England, even in the ancient period of her jurisprudence, when power was arbitrary and the rights of the subject but ill-defined, such prerogative was not claimed. It is true, that, in early times, "when a man died intestate, and had made no disposition of his goods, nor committed his trust to any, in such case the King, who was *parens patriæ*, and had the supreme care to provide for all his subjects, that every one should enjoy that which he ought to have, used by his ministers to seize the goods of the intestate, to the intent they should be preserved and disposed for the burial of the deceased, for payment of his debts, to advance his wife and children, if he had any, and if not, those of his blood." *Hensloe's Case*, 9 *Co.*, 38 *b.* Therefore, the holding by the King was a mere trust. Afterwards this care and trust was committed to ordinaries, until finally, to correct the abuses of their administration, the subject was regulated by statute. 1 *Wms. on Ex'rs*, 330. But here with us, the power of the State over the subject-matter has been and is the law-making power, and that alone, whereby general rules and regulations are prescribed for the government of the people and the disposition of their property. These general rules prescribed by the Legislature, all persons are supposed to be aware of, and to act in reference to them. Rights that pass and become vested under the existing law of the land are supposed to be beyond the control of the State through its Legislature. The mere change of the law does not divest or impair the rights of property acquired before the change, even though the Legislature may intend the new law so to operate. "A law," says Puffendorff, "can be repealed by the law-giver ; but the rights which have been acquired under it while it was in force, do not thereby cease. It would be an act of absolute injustice,

to abolish with a law all the effects which it had produced."
*L. Nat. and n.*, *Bk.* 1, *ch.* 6, *secs.* 6 *and* 7. This is a prin-
ciple of general jurisprudence; but a right to be within
its protection must be a vested right. It must be some-
thing more than a mere expectation based upon an antici-
pated continuance of the existing law. "It must have
become a title, legal or equitable, to the present or future
enjoyment of property, or to the present or future enforce-
ment of a demand, or a legal exemption from a demand
made by another." *Cooley, Const. Lim.*, 359. And as
said by Mr. Justice WOODBERRY, in *Merrill vs. Sher-
burne*, 1 *N. H.*, 213, Acts of the Legislature will not be
regarded as violating fundamental axioms of legislation,
"unless they impair rights which are vested; because
most civil rights are derived from public laws: and if,
before the rights become vested in particular individuals,
the convenience of the State procures amendments or
repeals of those laws, those individuals have no cause of
complaint." But where rights, not of a penal nature,
nor such as merely relate to remedies, have become vested,
such rights are considered as being beyond the power of
the Legislature to divest them. 1 *Kent Com.*, 455; 2
*Sto. on Const.*, *sec.* 1399. This principle is of the utmost
importance, and no Court in the country has been more
emphatic than this in giving sanction to it, and denying
validity to legislation which sought, by retroactive opera-
tion, to divest rights of property which had become vested
before such legislation occurred. This has been decided
upon several occasions; and as cases germane to the
present, where such legislation was denied effect, we may
refer to those of *Wilderman vs. The Mayor & City Council
of Balto.*, 8 *Md.*, 551, and *State, use of Trustees vs War-
ren*, 28 *Md.*, 338.

Now, with these well established principles in mind, let
us see what are the terms of the statute under which the
appellant claims. The terms, material to the question

here involved, are, that " the whole surplus shall belong to the State, *and shall be paid* to the college, if any, in the county where the deceased shall die." It will be observed that the language which declares to whom the fund shall be paid is equally positive and unequivocal as that which declares that the fund shall belong to the State. If, therefore, the terms employed vested a legal right in the State, it would seem to be equally clear that the terms which follow vested the equitable and beneficial right in the college. If the statute had simply declared that the fund should be paid over to the college, without the intervention of the State, we suppose it would not be contended for a moment that the Legislature could, by an Act subsequent to the death of the intestate, divert the fund, and either turn it into the State treasury, or apply it to other objects. Or if, instead of declaring that the fund should belong to the State to be paid to the college, it had declared that the fund should belong to some third party, other than the State, to be paid over to the college, it would present a case equally free from legislative interference and control. And if all disposable right of the State would be excluded in the cases supposed, we do not perceive why it should be thought that the State held an absolute disposable right to the fund in the case as it actually exists. The State is only a medium, a mere trustee, with a full and explicit declaration of trust, made by authority of the trustee itself; and in such case, as between individuals, it would be perfectly clear, that, not only would the relation of trustee and *cestui que trust* exist, but a perfect title in equity be created, which Courts of equity would enforce; for it is now well settled that if a person effectually declares himself to be trustee for another of money or property to be recovered, such declaration will be binding against him and his representatives. *Ex parte Pye*, 18 *Ves.*, 149; *Dipple vs. Corles*, 11 *Hare*, 183; *Peckham vs. Taylor*, 31 *Beav.*, 250. We do not say, how-

ever, that such would be the effect of a gratuitous appropriation by the State of its own revenue. In such case, it may well be that the Legislature could withdraw the appropriation by a repealing Act at any time before the money was actually paid over. But if the fund here in question did not belong to the State, and form a part of its disposable revenue, the principle upon which such an appropriation may be revoked can have no application to this case. And by way of further test of the question, whether the fund in controversy was at the absolute disposal of the State, let us suppose that, instead of declaring that the fund should belong to the State, to be paid over to the college, the statute had declared that the fund should belong to the State, and should be paid over to the relations of the deceased beyond the fifth degree ; or, to put the case still stronger, that the fund should belong to the State to be paid to the relations of the intestate within the fifth degree : would any one contend that the State could lawfully ignore the claims of the relations of the deceased, and appropriate the fund to other objects at pleasure, upon the theory that the fund had devolved upon the State absolutely, and that the explicit direction to pay over to the relations of the deceased formed no part of the law of distribution, and conferred no rights that the Legislature was bound to respect ? Such proposition, we suppose, would not be attempted to be maintained ; and if not, upon what principle is it that the provisions of the statute requiring the fund to be paid over to the college, can be revoked and utterly disregarded ? The matter of distribution of an intestate's personal estate is regulated by positive law, and any person within the rules prescribed acquires a right of which he cannot be divested by a retroactive law. The Legislature has thought proper, in prescribing the rules of distribution, to exclude all the relations of the intestate beyond the fifth degree, and to substitute colleges and schools as the recipients of the sur-

plus of the intestate's personal estate. But we are not aware that such distributions have ever been regarded as mere donations from the funds of the State. On the contrary, such distributions have been made either to the State for the use of the schools, or to the schools and colleges directly without the intervention of the State; but the rights of such schools and colleges have been supposed to be founded upon the positive law of distribution; and upon that theory funds so distributable have been sued for and recovered directly by the institutions entitled. *Charlotte Hall School vs. Greenwell*, 4 *Gill & J.*, 407 ; and *Thomas vs. Visitors of Frederick County School*, 7 *Gill & John.*, 369. Suits could not have been maintained upon any other than vested rights of action; and therefore the Court must have assumed, and did assume, and affirmed, that there was a vested right in the fund sued for.

But it is contended in this case, that though the Legislature may have no power to pass laws to divest vested rights of property, yet, under the terms of the statute, no right to the surplus could vest until the surplus was ascertained and ready to be paid over; and until that time it was competent to the Legislature to repeal the law in force at the time of the death of the intestate, and prescribe a new rule for the distribution of his estate, and according to which the fund would pass and should be paid over by the administrators. But to this we cannot accede. While the fund was not receivable by the college until after administration and the surplus ascertained, the right vested from the death of the intestate; and it was the right of the college to insist upon a faithful administration of the intestate, and to require an account in order to determine the real surplus to which it was entitled. 7 *Gill & John.*, 369 ; see also 8 *Md.*, 551, and 28 *Md.*, 338.

The principle contended for by the appellees is not only wrong as it would effect the rights of the college, but it is wrong as it might, by possibility at least, operate to defeat

the deliberate purpose of an intestate. Without at all intimating that the intention of the intestate in the present instance would be defeated, yet,. all persons, capable of making their wills, have a perfect right to dispose of their estates at pleasure, and they do dispose of them by allowing them to pass after their death, according to the then existing law of the land, with which they are supposed to have been acquainted. They are supposed to have known and understood the consequences of dying intestate; and their intestacy, to use the language of Chief Justice GIBSON, in *Norman vs. Heist*, 5 *Watts & Sergt.*, 171, may often be "perhaps less the effect of accident than design." At any rate, the Legislature is not warranted in any particular case in assuming that the intestacy of a party was purely accidental; and thence proceed to direct the disposition of his estate to objects different from those prescribed by the law existing at the time of his death.

It follows that the Act of 1876, ch. 295, repealing and re-enacting the 136th section of Art. 93 of the Code, is without .effect so far as this case is concerned; and that the special Act of 1876, ch. 337, was passed without competent authority to give it effect, and that it is, therefore, .a nullity.

The order appealed from, sustaining the demurrer and dismissing the bill, must be reversed, and the demurrer be overruled; and the cause will be remanded for further proceedings in accordance with this opinion.

*Decree reversed, and*
*cause remanded.*

(Decided June 14th, 1877.)